

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR 2 6 2011

CLERK, U.S. DISTRICT COURT
By _____
Deputy 9:43a.m.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BRENDA SELLERS,                   §
                                  §
        Plaintiff,                §
                                  §          Case No.3:09-cv-1887-F
v.                                §
                                  §
PFIZER INC.                       §
                                  §
        Defendant.                §

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is Defendant Pfizer's Motion for Summary Judgment (Docket No. 44), filed on February 4, 2011. A hearing was held in this matter on April 21, 2011. Having reviewed the arguments of the parties, the admissible evidence, and the applicable law, the Court is of the opinion that Pfizer's Motion should be GRANTED IN PART AND DENIED IN PART.[1]

### Background

Defendant Pfizer is a pharmaceutical company which sells its products through sales representatives who are assigned territories by zip code. In its performance evaluations of these sales representatives, Pfizer uses a metric based on a representative's various competencies and their sales quota achievement. The relative weight of each factor in this metric is disputed by the parties. When determining sales quota

_____
[1] This disposes of Docket No. 44.

1

achievement, Pfizer attributes the number of prescriptions written in each zip code to the sales representatives responsible for selling that product in that zip code. Thus, all sales are not necessarily a direct result of a particular salesperson's efforts.

Plaintiff Brenda Sellers was a pharmaceutical sales representative with Pfizer beginning in 2000 when Pfizer acquired the pharmaceutical company where Sellers was employed as a sales representative. Around June 2005, Sellers was informed that she was going to be laid off and was given the choice between a severance package and another position. Sellers alleges that she chose the severance package, but the Human Resources department ("H.R.") told her that she could not select that option because she had applied and been chosen for a position in North Texas. In addition to denying that she had ever applied for this position, Sellers indicated that the new territory was hours outside of her home territory, which was in violation of Pfizer policies. After she informed H.R. of this, Sellers alleges that Pfizer simply re-aligned the North Texas territory so that a small part of it fell within her home territory. Sellers has stated that she took the position because the severance package was no longer available and the alternative was unemployment.

In September 2005, Sellers was transferred to the new territory and Chris Belshe became her District Manager. During their first meeting, Belshe allegedly told Sellers that he was very upset he had to supervise her because she had a bad reputation and no one else wanted to supervise her. During the first five months after Sellers's transfer, Pfizer alleges that Belshe repeatedly expressed his concerns with Sellers's failure to close and her lack of familiarity with the physicians and their staff. Sellers has alleged that she

2

received praise from Belshe for her impressive sales and her handling the district by herself.  Sellers was the only sales representative in her two-person district during this time because the other sales representative, Kalea Buzbee, was out on maternity leave.

Sellers was in an on-the-job car accident which resulted in multiple injuries on March 8, 2006.  She filed a worker's compensation claim for the injuries, informed Belshe of her injuries, and was placed on a restricted 8-hour work day by her physician. Sellers has testified that she worked an average of 12 hours per day before the accident, but part of this time included the several-hour commute that she had to make each day. Thus, Sellers argues that the 8-hour restriction had a significant impact on the amount of time she could spend in the field "calling" on physicians.  The parties dispute whether it was appropriate to consider her commute when calculating her work day.  Sellers work time was also affected because she was required to attend physical therapy appointments three times a week until April 22, 2006.  Sellers alleges that Belshe expressed annoyance at Sellers's injured state and restricted work day.  Belshe also allegedly became markedly more critical than he had been before her accident.  In a call to the Regional Manager, Don Sanderson, Belshe expressed doubt regarding whether Sellers had ever been approved to take time off for rehabilitation.

On May 2, 2006, Sellers filed a report with Pfizer's compliance hotline against Belshe alleging that he had been harassing her and trying to force her to resign after her accident.  On May 5, 2006, Sellers' physician restricted her to a 6-hour work day and prescribed a second round of physical therapy treatments.  In June 2006, Belshe

3

acknowledged that Sellers had completed an acceptable number of calls and that she had exceeded her sales quotas, but he also criticized for her failure to close at the end of each call and for her lack of familiarity with the physicians' staff. Sellers took a medical leave of absence from July 31, 2006 to October 5, 2006. Upon returning, Sellers remained on an 8-hour work day restriction until March 19, 2007. Kalea Buzbee left Pfizer in October 2006 when her maternity leave ended. Jason James was hired to replace Buzbee in April 2007.

In December of 2006, Belshe gave Sellers poor rankings in areas such as selling skills, territory optimization, and team contribution despite the fact that Sellers had exceeded her sales quota for the year and increased her market share during this time. Belshe has stated that Pfizer's team environment means that weak salespeople are often masked by strong salespeople on their team. Belshe has also stated that many doctors prefer Pfizer's "superior products" and thus will write prescriptions without the influence of a salesperson.

Belshe met with Sellers in April 2007 to inform her that her call average was the lowest in the district at 5 calls per day rather than the standard of 9. A "call" is a short-hand description for an in-person visit to a physician's office – not a telephone call. Sellers maintains that this was a direct result of her restricted work days which meant that she could not physically visit as many offices and because her territory was much less densely populated. Sellers also disputes the way in which these calls were calculated.

4

In September of 2007, Belshe told Sellers that her continued performance issues and her inability to improve were a serious problem. Sellers was placed on an Immediate Action Plan ("IAP") on October 3, 2007. Human Resources Manager Cory Littlepage and Regional Manager Donald Sanderson reviewed this plan and its documents before it was presented to Sellers. The IAP laid out several areas that needed improvement as well as a plan for accomplishing that improvement. The IAP noted that: Sellers had only conducted one physician speaker program year to date even though four such programs were expected each year; Sellers's call average was too low; Sellers and the physician staff still seemed unfamiliar with each other even after she had worked in the district for two years; and Sellers still failed to use the Pfizer Selling Model consistently.

Although Sellers showed improvement in her call average during the IAP, Pfizer alleges that her performance was still inadequate in many areas. Sellers alleges that all objective performance measures were met by the end of the IAP period. This includes the number of calls per day which she alleges she was able to reach by ignoring the work day restrictions imposed by her doctor. Because the daily call average was no longer an issue by the end of Sellers's IAP, Pfizer alleges that call averages were not part of its eventual decision to terminate.

Because Sellers's implementation of the Pfizer selling model was still a concern, Sellers was placed on a Performance Improvement Plan ("PIP") on January 29, 2008. Sanderson met with both Sellers and Belshe to discuss the PIP and she was sent to the regional office on February 13, 2008, to receive corporate training from Bill Maschmeier.

Mr. Maschmeier rated Sellers as needing improvement in many areas including closing. As part of the PIP, Sanderson and Belshe separately accompanied Sellers on her sales routes to observe her performance. Both indicated that she was unsatisfactory in certain skills and that she needed improvement in others, such as closing. Belshe also indicated that physician staff members still seemed unfamiliar with Sellers and that Sellers had only scheduled one speaker program for the first semester of 2008. Sellers has stated that she felt she had followed through with all of the PIP's expectations by its end.

In April 2008, Sanderson made the decision to terminate Sellers after a review by Pfizer's Human Resources and Legal departments. Pfizer claims that it terminated Sellers's employment because of poor performance over the last two years, her failure to improve after this was brought to her attention, and her poor performance on the PIP. Sellers was the oldest person under Belshe's supervision.

Sellers asserts that the she was not under-performing, and that she was actually terminated because of her age, because she filed a worker's compensation claim, and because she took medical leave. Sellers filed a Charge of Discrimination with the EEOC on July 31, 2008, and commenced this action on October 6, 2009. She amended her Original Complaint on August 6, 2010. In addition to claims under the FMLA and Section 451 if the Texas Labor Code, Sellers's Complaint alleges that she was discriminated against on the basis of her age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*

## Legal Standard

6

Summary judgment is appropriate if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). In the summary judgment process, both movants and non-movants bear burdens of proof. *See generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322-23.

The moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses. *Id.* at 323. At that point, the burden shifts to the non-moving party to produce evidence in support of its claims or affirmative defenses. *Id.* at 324. The non-moving party must produce "specific facts" showing a genuine issue for trial and not mere general allegations. Fed. R. Civ. P. 56(e); *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). It is important to note that "[n]either 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

In deciding whether to grant summary judgment, the Court should view the evidence in the light most favorable to the party opposing summary judgment and indulge all reasonable inferences in favor of that party. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). "The standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether

7

a rational trier of fact could find for the non-moving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To the extent that facts are undisputed, the Court may resolve the case as a matter of law. *Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994).

## Discussion

### I.   Age Discrimination Based Upon an Adverse Employment Action

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "When a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Rachid v. Jack in the Box*, 376 F.3d 305, 309 (5th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). A plaintiff alleging age discrimination must first establish a prima facie case by showing that: "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Id.* (quoting *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003)). "Regardless of how much younger his replacement is, a plaintiff in the protected class may still establish a prima facie case by producing evidence that he was 'discharged

8

because of his age.'" *Id.*

If a plaintiff establishes a prima facie case, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). The defendant must present the reason for its treatment of the plaintiff by pointing to admissible evidence in the record legally sufficient to justify a judgment in its favor. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (U.S. 1981).

If the defendant meets its burden of production, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2352 (2009). This does not mean that a plaintiff is required to establish that age was the sole reason they were discharged. *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (2003). "The plaintiff must prove that age 'actually played a role in' and 'had a determinative influence on' the employer's decision-making process." *Id.* (quoting *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997). "To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). To prove pretext, "a plaintiff need only bring evidence that enables the jury to disbelieve that the employer's proffered justification truly motivated the adverse employment action." *Laxton*, 333 F.3d at 580 n.2. "Generally, an employee may attempt to show pretext by presenting evidence that the employer's reason for the adverse employment action was

9

(1) factually baseless; (2) not the actual motivation for the discharge; or (3) insufficient to motivate the discharge."*Acker v. Deboer, Inc.*, 429 F. Supp. 2d 828, 842 (N.D. Tex. 2006) (Buchmeyer, J.)

Because it is appears uncontested that Sellers has established a *prima facie* case, the Court's analysis will begin with Pfizer's proffered legitimate, non-discriminatory reason for Sellers's termination. Pfizer argues that there is an abundance of evidence demonstrating that Sellers was legitimately terminated for unsatisfactory performance and her failure to accomplish the goals of the PIP. The Fifth Circuit has recognized that "[p]oor work performance is a legitimate, non-discriminatory reason for discharge." *Perez v. Region*, 307 F.3d 318, 326 (5th Cir. 2002).

Pfizer alleges that Sellers was terminated because she failed to make an impact and implement the Pfizer sales model. Sellers argues that because these reasons are purely subjective and require credibility assessments, they are insufficient to justify a grant of summary judgment. An employer's subjective assessment may serve as a legitimate, nondiscriminatory reason for employment decisions, but such a reason will only satisfy the employer's burden of production "if the employer articulates a clear and reasonably specific basis for its subjective assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007). Even though subjective criteria "'may serve legitimate functions, they also provide opportunities for unlawful discrimination' because the criteria itself may be pretext for age discrimination." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) (quoting *Lindsey v. Prive Corp.*, 987 F.2d 324,

10

327 (5th Cir. 1993)). Pfizer argues that the reasons for Belshe's assessments are clearly articulated in the various coaching guides, performance reviews, IAP, and PIP. Sanderson, the regional manager, and Maschmeier, the corporate trainer, also independently observed Sellers's need for improvement in closing skills and being more succinct.

In order to refute the sincerity of Pfizer's proffered reason, Sellers offers the Affidavit of Kay McKelvey, a former Pfizer pharmaceutical sales representative who now sells for a different company. McKelvey's Affidavit states that Sellers was "one of the best reps out there" because she was "a very good communicator" and she was very knowledgeable about the products. McKelvey Dec. ¶ 7, Pl.'s App. 22, Docket No. 55. McKelvey also stated that Pfizer's subjective evaluations which are based on the Pfizer sales model do not make sense because all of the other pharmaceutical sales companies she has worked for evaluated salespersons based on their sales numbers. *Id.* at 23. Although McKelvey's Affidavit contradicts Pfizer's evaluations of Sellers, it also confirms that Pfizer uses the selling model when evaluating performance.

Pfizer's inability to identify any other employee who has been fired for failing to follow the Pfizer sales model raises serious questions regarding the credibility of its proffered reason. *See* Pl.'s Supp. App. 10-11, Interrogatory 14, Docket No. 61. Pfizer alleges that Sellers was terminated for failure to implement the sales model and Sanderson has testified that terminations more commonly result from this type of deficiency rather than poor sales results. Def.'s Reply 14, Docket No. 56; Sanderson

11

Depo. 31-32, Pl.'s App. 49-50, Docket No. 55.  A reasonable juror could certainly decide that Sanderson's testimony cannot be trusted given the fact that no other employees appear to have been terminated for this reason.  Such a juror could also question the sincerity of Pfizer's arguments regarding the importance of the sales model, and thus its proffered legitimate nondiscriminatory reason, because it is peculiar that Sellers may be the only employee Pfizer has terminated based on her use of the sales model.

Sanderson testified in his deposition that the sales model accounted for 50% of Sellers's performance evaluation.  This figure does not appear to be supported by anything such as a manual or other written document and Sellers alleges that the sales model was not normally an issue unless a salesperson's sales numbers were down.  Because there is no documentation of the relative weight that implementing the sales model normally plays in Pfizer evaluations, a reasonable juror could find that Sanderson's testimony on this matter, as an interested witness, is not credible.  The fact that Pfizer has been unable to identify any other employees who were terminated for a failure to implement the sales model also raises questions as to whether this typically makes up 50% of an employee's evaluation.  A reasonable juror could decide it is unlikely that the sales model is truly half of Pfizer's evaluation criteria considering there are no materials corroborating this practice and the fact that no other employees appear to have been terminated based on failure to follow this model.  If a juror were to decide that this figure is false, they may also infer that it was given because Pfizer's reliance on the sales model is pretextual.

Sellers alleges that Belshe and Sanderson both testified that following the sales model was essential because it would result in increased sales and failing to do so would result in decreased sales. Sellers alleges that during the time of her alleged failure to follow the model, her sales volumes were consistently higher than the other salespersons in her district and she regularly exceeded her sales quotas. Indeed, Sellers received multiple raises during the time that she was allegedly underperforming and she was the only salesperson in her two person district for the majority of 2006. Thus, Sellers argues that a reasonable juror could conclude that Pfizer merely relied on this explanation as a pretext for discrimination because she was a good employee and the Pfizer sales model was not important. Because Sellers has failed to indicate where the alleged testimony of Belshe and Sanderson appears in the record, it is difficult to verify these allegations. Even if this testimony does not exist, the reasoning of this argument could still raise questions in a reasonable juror's mind regarding the genuine importance of the sales model given the issues raised by the two preceding arguments.

Sellers also argues that Pfizer treated a younger employee more favorably because it failed to uniformly apply its call requirement policies to Jason James, the other sales representative in Sellers's district. This is because Sellers's IAP required that 75% of her calls be "D.S." calls (longer calls where samples are left and a physician's signature is required) even though James conducted fewer D.S. calls per day than Sellers and less

than half of his calls were D.S. calls.[2] James was allegedly never placed on an IAP or even chastised for this. Sellers contends that this non-uniformity is evidence of pretext because it appears that Belshe's policies were either: (a) enforced against Sellers, but not James, or (b) created by Belshe exclusively for Sellers. Pfizer merely argues that there is no indication that this figure was used in placing her on the IAP or in the decision to terminate. Pfizer's arguments do not dispute the accuracy of these allegations which appear to indicate that a younger employee was treated favorably and that a different standard was used for Sellers. If a juror finds that a different standard was used here, then they may also find that a different standard was used regarding the importance of the sales model when Sellers was terminated. Even without direct evidence that the D.S. call requirement was part of the ultimate decision to terminate, a reasonable juror could conclude that this is evidence of pretext and age discrimination.

Pfizer argues that Sellers "must show that (1) the stated reason is untrue *and* (2) age bias is the real reason for the discharge" in order to survive summary judgment. Def.'s MSJ 26, Docket No. 45. This argument is based on the Supreme Court's decision

---

[2] Sellers also makes two other arguments regarding allegedly different standards. First, Sellers alleges that James was treated more favorably because he would count "D.O." calls (shorter calls that do not leave samples) towards his daily call averages while she could not. However, the evidence appears to indicate that her daily averages included D.O. calls. Second, Sellers also argues that James was treated more favorably because he would count "literature drops" (very brief drop off of pamphlets which required no significant contact with the physicians) toward his call averages. Sellers has stated that she *usually* did not report such visits on her call report. This argument is based on Sellers's affidavit statement that James told her he did this. There is no allegation or indication that Pfizer ever knew anything about this behavior and Pfizer does not allow literature drops to be counted towards call averages.

in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993), which reversed an appellate court's holding "that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff." Contrary to Pfizer's argument, *Hicks* merely held that rejection of the defendant's proffered reason does not automatically mean that the plaintiff has won the case. The Supreme Court even stated that the "factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.* Because a reasonable factfinder may infer intentional discrimination from the rejection of a defendant's proffered reason, it would be inappropriate to apply the stringent standard promoted by Pfizer at the summary judgment stage.

"At this stage, a plaintiff is *not* required to introduce additional, independent evidence of discrimination." *Acker v. Deboer, Inc.*, 429 F. Supp. 2d 828, 842 (N.D. Tex. 2006) (Buchmeyer, J.). "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Laxton*, 333 F.3d at 578. "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Id.* "However, merely proving that a defendant's proffered reason is unpersuasive or contrived is insufficient to compel an inference that intentional discrimination occurred." *Acker*, 429 F. Supp. 2d at 842.

15

"[A] defendant may be entitled to summary judgment "if the record conclusively reveal[s] some other, nondiscriminatory reason for the [adverse] decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination has occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

The Court finds that a genuine issue of material fact exists which precludes summary judgment because Sellers has established a prima facie case and she has demonstrated that Pfizer's proffered reason may be false. "Witness credibility and the weight of the evidence are the exclusive province of the fact-finder." *U.S. v. Allen*, 587 F.3d 246, 257 (5th Cir. 2009). A reasonable juror could find that Pfizer's proffered reason is false because no other employees appear to have been fired for the same reasons, a different weight may have been given to the sales model when deciding to terminate Sellers, and Sellers appeared to be a successful salesperson. Such a juror could also find pretext because Pfizer employed different requirements and standards with Sellers than it did with a younger employee. Accordingly, Defendants' Motion is DENIED with respect to Sellers's ADEA claims based upon an adverse employment action.

## II.   Age Discrimination Claim Based Upon a Hostile Work Environment

Before addressing the parties' arguments regarding Sellers's hostile work environment claim, it is important to note that the Fifth Circuit has never actually

16

recognized a claim for hostile work environment under the ADEA. All of the decisions that even discuss the possibility of such claims do so in the hypothetical.

> [Plaintiff] also appears to claim a hostile work environment under the ADEA. We have never held that the ADEA contemplates hostile work environment claims. *McNealy v. Emerson Elec. Co.*, 121 Fed. App'x. 29, 34 n. 1 (5th Cir. 2005). Because-assuming *arguendo* that such claims are permitted-we affirm summary judgment against Mitchell, we need not reach that question.

*Mitchell v. Snow*, 326 Fed. App'x. 852, 854 n. 2 (5th Cir. 2009). Because the trial court's duty is to determine fact, the Court will assume that Sellers can pursue her ADEA hostile work environment claim and evaluate this potential claim on its merits. The following rules regarding ADEA hostile work environment claims are borrowed from other, recognized hostile work environment actions. These rules are also those used by the few Fifth Circuit decisions which assumed *arguendo* that such an action exists.

Hostile work environment claims are examined under a "totality-of-the-circumstances test that focuses on the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; and whether it unreasonably interferes with an employee's work performance." *Hill v. Dep't of Veteran Affairs*, 2009 WL 348767 at *4 (5th Cir. 2009). To constitute a hostile work environment, comments must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Moody v. U.S. Sec'y of Army*, 72 Fed. App'x 235, 239 (5th Cir. 2003). Simply being offensive and boorish is insufficient. *Id.*

17

> To establish a hostile work environment claim, a plaintiff must prove that: (1) he is in a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his status as a member of the protected class; [and] (4) the harassment affected a term, condition, or privilege of employment . . .

*McNealy v. Emerson Elec. Co.*, 121 Fed. App'x 29, 34 (5th Cir. 2005).[3]

Pfizer argues that Sellers has failed to establish the third and fourth elements of a prima facie hostile work environment claim because Sellers's evidence is vague at best and because her allegations do not even rise to levels of harassment that the Fifth Circuit has previously found insufficient. *See Ramsey v. Henderson*, 286 F.3d 264, 266-68 (5th Cir. 2002); *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042 (5th Cir. 1996); *Gonzalez v. Geren*, 2009 U.S. Dist. LEXIS 18861, 2009 WL 522935 (W.D. Tex. Jan 12, 2009). The Court agrees with Pfizer's characterization of the evidence and Sellers has failed to respond to any of Pfizer's arguments regarding this claim. Accordingly, the Court GRANTS Pfizer's Motion for Summary Judgment with respect to Sellers's hostile work environment claims under the ADEA.

## III.   Retaliation under the ADEA

A plaintiff alleging retaliation must first prove by a preponderance of the evidence "(1) that she engaged in activity protected by [the ADEA], (2) that an adverse

---

[3] *McNealy* also listed a fifth element: "(5) the employer knew or should have known of the harassment and failed to take remedial action." However, the Fifth Circuit dropped this element in sexual harassment hostile work environment claims when the alleged harasser is an immediate supervisor. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). *Watts* was decided after *McNealy*, so the Court will presume that no such element would be required for any similar ADEA claims, if such claims exist.

18

employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001) (discussing the elements of retaliation under Title VII). "The 'causal link' required in prong three of the prima facie case for retaliation is not as stringent as the 'but for' standard." *Id.* at 354. Accordingly, "a plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." *Id.*

Sellers argues that there is a genuine issue of material fact regarding the first and third elements of the prima facie case that renders summary judgment inappropriate on this claim. Sellers maintains that the first element has been met because she allegedly complained about age discrimination in a letter she sent to Senior Human Resources Director LaShanna Farley in 2005. This was before she was transferred to Belshe's district and Farley has testified that she never received the letter. With respect to the third element regarding causation, Sellers simply argues that the evidence previously discussed regarding pretext also demonstrates the requisite causal connection for retaliation. However, there is nothing in the evidence which indicates a causal link between her termination and the letter to Farley or even that any of the decision makers in her termination knew of that letter. Because Sellers's alleged complaint regarding age discrimination occurred nearly three years before her termination and because there is no evidence indicating causation, the Court finds that Sellers has not satisfied the third element of her prima facie case. Accordingly, the Court GRANTS Defendant's Motion

regarding Sellers's ADEA retaliation claims.

## IV.   Sellers's Workers Compensation and FMLA Retaliation Claims

Pfizer argues that it is entitled to summary judgment on Sellers's claims for retaliation under the Texas Workers' Compensation Act ("TWCA") and the Family and Medical Leave Act ("FMLA") because: (1) Sellers cannot establish a causal connection between her claim for benefits or leave and her subsequent termination two years later; (2) Pfizer has established that its actions were for non-discriminatory and non-retaliatory reasons; and (3) Sellers cannot raise a genuine issue of material fact that Pfizer's reasons are pretextual.

### A. Retaliation Based on Sellers's Workers' Compensation Claim

Sellers has brought a claim alleging retaliation resulting from her March 2006 TWCA claim in violation of Texas Labor Code § 451.001.   Under § 451.001, an employer may not discharge or discriminate against an employee because that employee has: "(1) filed a workers' compensation claim in good faith; (2) hired a lawyer to represent the employee in a claim; (3) instituted or caused to be instituted in good faith a proceeding under [the TWCA]; or (4) testified or is about to testify in a proceeding under [the TWCA]." *Id.* "Unless one of the four specific circumstances in the article motivated the employer in discharging or discriminating against the employee, that employee cannot prevail on a claim based on this article." *Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 589 (5th Cir. 1995)

"A plaintiff does not have to prove that her discharge was *solely* because of her

20

workers' compensation claim." *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996) (emphasis added). "To prove a 'retaliatory discharge' claim, the employee must show that the employer's action would not have occurred when it did had the employee's protected conduct-filing a workers' compensation claim-not occurred." *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005). Circumstantial evidence and reasonable inferences from the evidence can establish the causal connection. *Cont'l Coffee*, 937 S.W.2d at 451. Although not elements of retaliation, circumstantial evidence offered to establish a causal link may include any of the following:

> (1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false.

*Aust v. Conroe Indep. Sch. Dist.*, 153 S.W.3d 222, 228 (Tex. App.—Beaumont 2004, no pet.). If the employee can establish a causal link, the employer must rebut the alleged retaliation by showing that there was a legitimate reason for the discharge. *Cont'l Coffee*, 937 S.W.2d at 451. "[A] worker's subjective impressions-in the absence of competent evidence of retaliation-will not support a finding of relief under this statute." *Burch v. City of Nacogdoches*, 174 F.3d 615, 623 (5th Cir. 1999); *see also Tex. Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994).

Sellers incorporates the previously discussed evidence of pretext when making out her TWCA retaliation claim. Other than her allegations regarding Belshe's attitude

21

change, Sellers has failed to provide any of the *Aust* types of circumstantial evidence that traditionally establish a causal link.  In particular, Sellers does not dispute that neither Belshe nor Sanderson knew of her filing for worker's compensation benefits; she has failed to show that any established policies were not followed; and there were more than 24 months between the filing of her claim and her termination. *See Burch*, 174 F.3d at 623 (discussing rebuttable presumption which "militates against a finding of retaliation" created by 15-16 months elapsing between the claim and discharge).

Sellers's claim for retaliation under the TWCA fails because she has failed to rebut the presumption created by the significant lapse in time between her claim and her termination.  Even if there were no such presumption, Sellers has not presented evidence which would allow a reasonable juror to conclude that her termination was caused by retaliation for her TWCA claim.

### B.  Retaliation Based on Sellers's Family Medical Leave Act Leave

Sellers has brought a claim alleging retaliation resulting from her nine weeks of FMLA-qualifying leave beginning July 28, 2006.  In order to establish a prima facie case of retaliation under the FMLA, Sellers must show the following: "1) [s]he was protected under the FMLA; 2) [s]he suffered an adverse employment action; and 3) [s]he was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because [s]he sought protection under the FMLA." *Mauder v. Metro Transit Auth. of Harris Cnty.*, 446 F.3d 574, 583 (5th Cir. 2006).  After a plaintiff establishes a prima facie case, the Title VII burden-shifting analysis applies

22

and the employer must show that the employee would have been terminated anyway. *Id.* "Thereafter, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reasoning presented by the defendant is a pretext for retaliation." *Id.* "When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave, and the termination." *Id.*

Sellers incorporates her evidence regarding pretext when making out her FMLA claims. Pfizer has alleged that Sanderson did not have any knowledge of Sellers's FMLA leave when he made the decision to terminate because he did not become her manager until after her leave had ended. As with her other retaliation claims, Sellers has failed to create a genuine issue of material fact regarding causation. Because Sellers has presented little to no evidence that her termination was in retaliation for her FMLA leave and because her termination occurred 19 months after she returned from leave, the Court GRANTS Defendants Motion with respect to Sellers's FMLA retaliation claims.

### Conclusion

For the reasons stated above, Defendant Pfizer's Motion for Summary Judgment (Docket No. 44) is GRANTED IN PART AND DENIED IN PART.

Pfizer's Motion is GRANTED to the extent that it seeks summary judgment on Sellers's claims of a hostile work environment under the ADEA, retaliation under the ADEA, retaliation under the TWCA, and retaliation under the FMLA.

Pfizer's Motion is DENIED to the extent that it seeks summary judgment on

Sellers's claims of age discrimination through an adverse employment action.

It is so ORDERED.

Signed this _26th_ day of April, 2011.

Royal Furgeson
Senior United States District Judge